RECEIVED

U 2023

# IN THE UNITED STATES DISTRICT COURT

# FOR THE SOUTHERN DISTRICT OF MISSISSIPPI

# OXFORD DIVISION

| | | |
|---|---|---|
| United States of America, | § | |
| V. | §. | Criminal No. 3:21-cr-107-SA |
| Thomas Ayodele, | § | |

## MOTION TO REDUCE SENTENCE PURSUANT TO 28 U.S.C. § 3582 (C)(2) AND AMENDMENT 821 TO THE U.S. SENTENCING GUIDELINES PART C (MARIJUANA POSSESSION) IN EFFECT SINCE NOVEMBER 1, 2023

COMES NOW, the defendant THOMAS AYODELE, representing himself under Haines v. Keener, 404 U.S. 519, 92 S. CT. 594, 30 L. Ed. 2d 652 (1972), and very respectfully submits his Motion to Reduce his sentence to 28 USC § 3582(C)(2) and Amendment 821 to the Sentencing Guidelines Part C (MARIJUANA POSSESSION). May this Honorable District Court grant the following relief:

## RELIEF SOUGHT

## TO REDUCE THOMAS AYODELE'S BOL AT 30 CHC II

## RESULTING IN 108 MONTHS SENTENCE

1

## **FACTUAL BACKGROUND**

On November 4, 2022, Jamarr Smith filed a Motion to Suppress Thomas Ayodele and Gilbert McThunel filed Joinders to the Motion. The Defendants seek to suppress all evidence derived from the November 2018 geofence warrant which was used to identify them as suspects of a robbery that took place in February 2018. Hereby, these facts elaborated by this Honorable District Court's **ORDER AND MEMORANDUM OPINION dated 02/10/2023** are submitted to preserve issues of innefective assistance and most particularly on prosecutorial misconduct for collateral review.

Around 5:25 PM on February 5, 2018, a U.S. Postal Service Highway Contract Route Driver, Sylvester Cobbs, was robbed as he was picking up mail from the Lake Cormorant Post Office, in Lake Cormorant, Mississippi. Cobbs' job as a driver consisted of picking up mail from the Dundee, Tunica, Robinsonville, Lake Cormorant, and Walls, Mississippi Post Offices and transporting mail to the Processing and Distribution Center in Memphis, Tennessee.

According to Cobbs, on the day in question, he was parked in the parking lot of the post office when he was approached from behind by an unknown African American male wearing a black long-sleeve shirt and a black ski mask who was approximately 5'9" to 6'0" tall. The man pointed a handgun at Cobbs with one hand and some form of mace with the other. The man then attempted to lock Cobbs inside the vestibule of the post office; however, Cobbs fought back with the man and the man pistol whipped Cobbs several times in return. After that, according to Cobbs, the man went to the back of the mail truck and took three registered mail sacks, which contained $60,706. The man also took Cobbs' post office keys. Thereafter, the man fled, and Cobbs drove his truck across the street to call his wife and postal management.

No suspect was arrested in connection to the robbery on the day of occurrence. However, in the following days, Postal Inspectors retrieved surveillance footage from a camera located at a nearby farm office. The camera captured the robbery on video. The video showed a red Hyundai (believed to be an Elantra) and a large white SUV (believed to be a newer model GMC Yukon XL) in the area. The video revealed the suspect getting out of the SUV before the robbery, and it is inferred that the suspect got back into the SUV before fleeing the scene. According to Todd Matney's (inspector of the United States Postal Inspection Service) affidavit in support of his search warrant application, the "Postal Inspectors conducted a detailed review of the video surveillance and it appears the robbery suspect is possibly using a cellular device both before and after the robbery occurs." Ex. 2 at p. 4. Stephen Mathews (former Postal Inspector and supervisor of the Oxford, Mississippi Postal Inspector's Office) testified at the hearing that he interviewed Cobbs, who was unable to identify any suspects because the suspect was wearing a ski mask.[1] Sometime after obtaining the video footage, but prior to applying for the warrant, Mathews located an eyewitness who lived across the street. According to Mathews, the witness asked the driver of the red Hyundai if he needed any help. The driver informed the eyewitness that he was looking for Highway 61. At this point in time, the witness was unable to identify the driver of the car.[2]

---

[1] For context, Mathews was the supervisor of the Postal Inspector's Office in Oxford, Mississippi in 2018- the time the warrant was applied for. At the time of the hearing, and currently, Mathews is no longer an active law enforcement officer. Therefore, the Court will hereinafter not refer to Mathews as an "Inspector."

[2] Mathews testified that after the three suspects were arrested (several months later), he presented the eyewitness with three separate photo lineups to see if the eyewitness could identify any of the suspects. Although the eyewitness was unable to identify McThunel or Smith in their respective lines, the eyewitness did identify Smith as the person he saw driving the red Hyundai.

## GEOFENCE WARRANT THAT FAILED TO COMPLY WITH STEPS 2 & 3

On November 8, 2018 (nine months after the robbery), Inspector Matney applied for a search warrant seeking information from Google to locate potential suspects and witnesses in connection to the February robbery. This specific type of warrant is known as a geofence warrant. According to Inspector Matney, he worked with Mathews, spoke with other investigators from other states who had applied for geofence warrants, and consulted with the United States Attorney's Office in Oxford, Mississippi before applying for the geofence warrant.

A geofence warrant is a fairly new investigative technique, wherein law enforcement request's location data from a third-party, such as Google. This type of warrant allows law enforcement to rely on technology to locate unknown potential suspects and witnesses of a crime. Attached to the Defendants' Motion to Suppress [74] is Spencer McInvaille's (the Defendants' expert) report which sets forth a three-step process that Google follows when responding to a geofence warrant. [3]

According to the report, a geofence warrant demands that Google search its database, known as the Sensorvault, to locate unknown suspects of crime. At the outset, law enforcement provides Google with geographical and temporal parameters around the time and place where the alleged crime occurred. The first step requires Google to search its Sensorvault for all users who have location history enabled at the time the warrant was executed. At the hearing McInvaille testified that, when acting in accordance with a geofence warrant, Google searches data for all users who had their location history enabled because the

---

[3] While the parties, to some extent, dispute the information returned from the geofence warrant in this case, the parties do not dispute the three-step process Google follows when it responds to a geofence warrant.

data itself is not capable of being stored in a way to search a specific area. Thus, Google searches all location history stored in its Sensorvault. Google describes the location history as a "[p]ersonal and private journal of the user's location." Id. at p. 1. To be clear, location history is not automatically enabled. A user must opt-in to sharing his or her location history either through phone set up or through an app.

After Google searches the Sensorvault and determines the accounts that were within the geographical parameters of the warrant, it returns to law enforcement a list giving each account an anonymized device ID, also including the date and time, longitude and latitude, the source, and the maps display radius. According to the report, "the maps display radius is indicated in meters and the radius is drawn around the center point referenced with the latitude and longitude" and "Google estimates the device should be located within the circle and states that their goal is for that to be true 68% of the time." Id. at 5. During the hearing, the Government introduced an exhibit illustrating this process, and McInvaille provided testimony explaining it in more detail.

**Step Two** is a request for contextual data. During this step, law enforcement reviews the anonymized list and determines which device IDs are relevant to the investigation. Then, law enforcement can request additional de-anonymized information that goes beyond the parameters of the initial geofence. According to Google, the purpose of this step is to potentially eliminate false positives or determine if a device ID is relevant. Id. at p. 7. This step also allows law enforcement to compel Google (if authorized in the request) to provide account-identifying information, such as an email address, for the device IDs that law enforcement deems relevant.

**In the third step,** Google produces the subscriber's information for the accounts that were determined relevant in Step Two. This data is provided in a de-anonymized format

which includes email addresses from Step Two, along with the names associated with the device IDs.

After the magistrate judge approved the warrant, Inspector Matney submitted the warrant to Google. Inspector Matney testified that, submitting the warrant to Google required him to access a legal portal and sign in with a government email address. After he signed in, Inspector Matney was able to upload the warrant and any subsequent documents through the portal.

Attached to the warrant was "Attachment A." Section II of the attachment outlined the three-step process that Inspector Matney submitted to the magistrate judge for his approval.

**Section II specifically provided:**

To the extent within the Provider's possession, custody, or control, the provider is directed to produce the following information associated with the Subject Accounts, which will be reviewed by law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate any evidence, fruits, and instrumentalities of 18 U.S.C. section 2114(a), Robbery of a U.S. Postal Service Employee.

1. Location Information. All location data, whether derived from Global Positioning System (GPS) data, cell site/cell tower triangulation/trilateration, and precision measurement information such as timing advance or per call measurement data, and Wi-Fi location, including the GPS coordinates, estimated radius, and the dates and times of all location recordings, between 5:00 p.m. CT and 6:00 p.m. CT on February 5, 2018;

2. Any user and each device corresponding to the location data to be provided by the "Provider" will be identified only by a numerical

identifier, without any further content or information identifying the user of a particular device. Law enforcement will analyze this location data to identify users who may have witnessed or participated in the Subject Offenses and will seek any additional information regarding those devices through further legal process.

3. For those accounts identified as relevant to the ongoing investigation through an analysis of provided records, and upon demand, the "Provider" shall provide additional location history outside of the predefined area for those relevant accounts to determine the path of travel. This additional location history shall not exceed 60 minutes plus or minus the first and last timestamp associated with the account in the initial dataset. (The purpose of the path of travel/contextual location points is to eliminate outlier points where, from the surrounding data, it becomes clear the reported point(s) are not indicative of the device actually being within the scope of the warrant.)

4. For those accounts identified as relevant to the ongoing investigation through an analysis of provided records, and upon demand, the "Provider" shall provide the subscriber's information for those relevant accounts to include, subscriber's name, email addresses, services subscribed to, last 6 months of IP history, SMS account number, and registration IP.[4] [74], Ex 3 at p. 2.

---

[4] Although this Section II information was not attached to the copy of the warrant attached to the Motion to Suppress [74], this appears to have been an oversight when the Motion [74] was initially filed. This issue was addressed at the hearing, and the Court has reviewed the official copy of the original warrant and notes that Section II was in fact part of the warrant.

As this quoted language illustrates, the language of the warrant largely tracks Google's three-step process outlined above. After receiving the warrant, Google followed its three-step process. Although the precise number of user accounts searched is unclear, Google estimated that number to be around 592 million accounts at the time the warrant was executed. The warrant authorized an hour-long search from 5:00 PM to 6:00 PM on February 5, 2018. The geofence covered approximately 98,192 square meters around the Lake Cormorant Post Office. The warrant, consistent with Step Two, authorized law enforcement to obtain additional location history for a registered device "60 minutes plus or minus the first and last timestamp associated with the account in the initial dataset." Id. Google returned Step One information in April 2019. This step returned three device IDs (in an anonymized format) within the requested parameters (with two of the three devices registering multiple times). See diagram below. Inspector Matney testified that he then reviewed the device IDs to ensure they fell within the geofence coordinates.

At this point, the parties' versions of events diverge. The Defendants contend that, before receiving Step Two data, **law enforcement did not follow the applicable Step Two** narrowing measures. Instead, without obtaining an additional warrant (which the Defendants contend violated the "further legal process" language in the warrant), Inspector Matney and Mathews decided which device IDs were relevant and requested additional de-anonymized information for all three devices. Although, the Defendants, along with McInvaille, contend that it appeared **Step Two had been skipped and it was not contained in discovery,**

## TESTIMONIES UNDER OATH SUPPORT INVALID SEARCH WARRANT

Inspector Matney testified at the hearing that, in May 2019, he requested Step Two data through the portal. According to Inspector Matney, he, along with Mathews, decided that the device IDs ending in "859" and "768" were relevant because those devices registered

multiple times within the geofence. They decided the third device ID, which only registered one time within the geofence, could have been a potential witness, but ultimately was not relevant to the investigation. Inspector Matney testified that on May 30, 2019, Google sent law enforcement a letter containing Step Two data. There was also testimony that the Step Two narrowing measures took place with a subsequent warrant (discussed below) obtained in July 2019. During this step, according to the Government, Google also expanded the search to include the additional location history on the registered devices, as authorized in the warrant.

At the beginning of June 2019, Inspector Matney was injured, requiring a leave of absence from work, and Mathews took over as the lead investigator. Mathews testified that he received Step Three data around June 10, 2019. This data included de-anonymized information for all three devices IDs. The following email address were returned:

"2165781.Key.cvs","bleek2004.AccountInfo.txt","jamarrsmith33.AccountInfo.txt", and"permanentwavesrecords.AccountInfo.txt."[5]

Through the information he received from Google, Mathews determined that the "jamarrsmith33.AccountInfo.txt" was Smith's email account and the "bleek2004.AccountInfo.txt" email account belonged to McThunel. At the hearing, Mathews testified that the email "permanentwavesrecords.AccountInfo.txt", which was associated with the third device, was deemed irrelevant to the investigation.

---

[5] Although this appears to be four separate email addresses, at the hearing, no reference was made to the "2165781.Keys.cvs" account. It is unclear to the Court what that email might reference. Nevertheless, it was clear at the hearing that the parties agree law enforcement only received de-anonymized information associated with three accounts-not four.

According to Mathews, he submitted another warrant (Google warrant) in the middle of July 2019. To be clear, this was not a geofence warrant, but instead sought location information as to those specific Google accounts that he had previously determined belonged to Smith and McThunel. Mathews testified that this warrant authorized specific location information connected to Smith and McThunel's accounts and showed them traveling from Batesville, Mississippi to Lake Cormorant, Mississippi on the day of the robbery. Mathews also obtained phone records on all three suspects. The phone records revealed a 350 second phone call between Smith and McThunel during the time of the robbery. The phone records also indicated a phone call between Ayodele and McThunel, which is how Ayodele was identified as a third suspect.

Ultimately, the Government was able to identify the three Defendants and obtain an Indictment [1] against them. In the Motion to Suppress [74], the Defendants argue that the geofence warrant was invalid from its inception because it lacked probable cause and particularity. The Defendants also take the position that they had a reasonable expectation of privacy in their location history and that the geofence warrant violated that reasonable expectation. Furthermore, the Defendants argue that, in the event that the warrant was valid, the Government did not undertake "further legal process" to obtain additional information from Google as it said it would do, which made Steps Two and Steps Three of the search warrantless and illegal. Finally, they argue that the good faith exception set forth in United States v. Leon, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984) does not excuse the defects of the warrant. They contend that the exclusionary rule should apply and that all the evidence seized constitutes "fruit of the poisonous tree."

## ISSUES THAT THOMAS AYODELE WOULE LIKE TO PRESERVE FOR COLLATERAL REVIEW UNDER SECTION 2255

Therefore, there is a strong presumption that constitutional rights has been ignored embracing not only innefective assistant of counsel but also prosecutorial misconduct. In fact, further legal process required law enforcement to obtain an additional warrant **BEFORE** requesting Step Two and Step three data. In this case it was the government who admitted that NO SUCH WARRANTS were obtained thus "good faith exception" won't even justify such violation of constitutional rights. Moreover, "counsels for both parties conceded that "**THERE WAS NO PUBLISHED AUTHORITY ON THIS ISSUE AT THAT TIME. EVEN TODAY THE CASE LAW IS SPARE!?** That is a serious manifest injustice!!

The Fourth Amendment guarantees that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the person or things to be seized." U.S. CONST. amend. IV. The Supreme Court has interpreted the constitutional prohibition against unreasonable searches to require that law enforcement obtain a warrant except in a narrow set of special circumstances. See Vernonia Sch. Dist. 47J v. Acton, 515 U.S. 646, 653 (1995). "When an individual 'seeks to preserve something as private,' and his expectation of privacy is 'one that society is prepared to recognize as reasonable,' . . . official intrusion into that private sphere generally qualifies as a search and requires a warrant supported by probable cause." Carpenter v. United States, 138 S.Ct. 2206, 2213 (2018) (quoting Smith v. Maryland, 442 U.S. 735, 740 (1979).[6]

---

[6] Contrary to counsel's assessments there is sufficient jurisprudence and pending United States Supreme Court arguments invalidating the geofence warrants for lack of particularly that Thomas Ayodele will use in the near future to vacate his sentence as a matter of law.

To issue in compliance with the Fourth Amendment, a warrant requires three things: (1) that it be issued by a "neutral, disinterested magistrate[];" (2) that it be supported by probable cause that the evidence sought will aid in "a particular apprehension or conviction for a particular offense;" and (3) that it "particularly describe the things to be seized, as well as the place to be searched." Dalia v. United States, 441 U.S. 238, 255 (1979) (cleaned up). Defendant does not dispute that a neutral magistrate issued the Geofence Warrant here, so the Court focuses on the probable cause and particularity requirements.

Assessing probable cause requires a "practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983). "Probable cause is more than bare suspicion but is less than beyond a reasonable doubt and, indeed, is less than a preponderance of the evidence." United States v. Burnett, 827 F.3d 1108, 1114 (D.C. Cir. 2016). As probable cause is a "fluid concept" that turns on "factual and practical considerations of everyday life on which reasonable and prudent [people], not legal technicians, act," the "duty of a reviewing court is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed." Gates, 462 U.S. at 232, 238-39, 241 (internal quotation omitted); see also United States v. Griffith, 867 F.3d 1265, 1271 (D.C. Cir. 2017) (explaining that "great deference to the judge's initial determination of probable cause" is required (internal quotation omitted)).

The requirement that a warrant state with particularity the place to be searched and the items to be seized serves the "manifest purpose . . . to prevent general searches." Maryland v. Garrison, 480 U.S. 79, 84 (1987). Accordingly, a warrant must be "no broader than the probable cause on which it is based." United States v. Hurwitz, 459 F.3d 463, 473 (4th Cir. 2006) (quoting United States v. Zimmerman, 277 F.3d 426, 432 (3d Cir. 2002). "By limiting the authorization to search to the specific areas and things for which there is probable cause

to search, the requirement ensures that the search will be carefully tailored to its justifications, and will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit." Garrison, 480 U.S. at 84. "In assessing particularity, courts are concerned with realities of administration of criminal justice," so it suffices if the warrant "is particular enough if read with reasonable effort by the officer executing the warrant." United States v. Dale, 991 F.2d 819, 846 (D.C. Cir. 1993) (internal quotations omitted). "In other words, a warrant must be 'sufficiently specific to permit the rational exercise of judgment [by the executing officers] in selecting what items to seize." DC, 579 F.Supp.3d at 76 (quoting United States v. LaChance, 788 F.2d 856, 874 (2d Cir. 1986)). While an "indiscriminate sweep is constitutionally intolerable," a "broader sweep" may be permissible "when a reasonable investigation cannot produce a more particular description." Griffith, 867 F.3d at 1275-76 (internal quotations omitted).[7]

Violations of the Fourth Amendment's guarantees are generally subject to the exclusionary rule, which requires courts to suppress evidence obtained through unconstitutional means. See, e.g., United States v. Weaver, 808 F.3d 26, 33 (D.C. Cir. 2015) (citing Mapp v. Ohio, 367 U.S. 643, 655 (1961); Weeks v. United States, 232 U.S. 383, 398 (1914)). This exclusion of evidence includes both "the primary evidence obtained as a direct result of an illegal search or seizure and . . . evidence later discovered and found to be derivative of an illegality, the so-called fruit of the poisonous tree." Utah v. Strieff, 579 U.S. 232, 237 (2016) (internal quotations omitted). Typically, "[t]he proponent of a motion to

---

[7] Incidentally, "in recent years, the number of GEOFENCE warrants received my Google has increased exponentially. Google received it's first in 2016. After that, Google observed over 1,500% increase in the number of Geofence request he received in 2018 compared to 2017 and the rate increased over 500% from 2018-2019. In 2019 Google received around $9,000 total geofence requests. On Google now report that geofence warrants comprise more than 25% of all warrants it receives in the United States." See United States v. Charlie, 590 F. Supp. 901 (4th Circuit Court) March3, 2022.

suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure." <u>Rakas v. Illinois,</u> 439 U.S. 128, 130 n.1 (1978) (citations omitted). In addition, under what has come to be known as the "good faith exception" to the exclusionary rule, "'evidence seized in reasonable, good faith reliance on a search warrant,' need not be excluded, even if the warrant turns out to have been unsupported by probable cause." <u>Griffith</u>, 867 F.3d at 1278 (quoting <u>United States v. Leon,</u> 468 U.S. 897, 905 (1984)); see also <u>Mass. v. Sheppard,</u> 468 U.S. 981 (1984) ("[T]he exclusionary rule was adopted to deter unlawful searches by police, not to punish the errors of magistrates and judges." (citation omitted)).

Notably, "Google my search across all locations history data, I'm run a computation I can every set of stored LH coordinates to determine which records match the geographic parameters in the warrant. Clearly, however, **Google can alter the data back to identify users in response to a Geofence warrant**!?" Id.

"This geofence warrants three steps does not cure it's defects: **CLEAR LACK OF PARTICULARITY.** Warrants must "particularly describe the place to be searched, and The persons or things to be seized." U.S. Const. Amend IV. In other words, "I warrant that meets the particularity requirement lives the executing officer with no discrimination as what to seize." See, <u>In re Search of information Stored at Premises Controlled by Google,</u> 481 F. Supp. 3d 730, 754 (N.D. I'll 2020).

But Steps two and three of this warrant leave the executing officer with unbridled discretion and lack of semblance of objective criteria to guide how officers would narrow the list of users. These issues are preserved for collateral review independently of this motion.

## APPLICABLE LAW AND AUTHORITIES

### Part A (Status Points under §4A1.1

The Commentary to §2P1.1 captioned "Application Notes" is amended in Note 5 by striking "§4A1.1(d)" and inserting "§4A1.1(e)". Section 4A1.1 is amended— by striking subsection (d) as follows: "(d) Add 2 points if the defendant committed the instant offense while under any criminal justice sentence, including probation, parole, supervised release, imprisonment, work release, or escape status."; by redesignating subsection (e) as subsection (d); and by inserting at the end the following new subsection (e): "(e) Add 1 point if the defendant (1) receives 7 or more points under subsections (a) through (d), and (2) committed the instant offense while under any criminal justice sentence, including probation, parole, supervised release, imprisonment, work release, or escape status.".

The Commentary to §4A1.1 captioned "Application Notes" is amended— by striking Note 4 as follows: "4. §4A1.1(d). Two points are added if the defendant committed any part of the instant offense (i.e., any relevant conduct) while under any criminal justice sentence, including probation, parole, supervised release, imprisonment, work release, orescape status. Failure to report for service of a sentence of imprisonment is to be treated as an escape from such sentence. See §4A1.2(n).

For the purposes of this subsection, a 'criminal justice sentence' means a sentence countable under §4A1.2 (Definitions and Instructions for Computing Criminal History) having a custodial or supervisory component, although active supervision is not required for this subsection to apply. For example, a term of unsupervised probation would be included; but a sentence to pay a fine, by itself, would not be included. A defendant who commits the instant offense while a violation warrant from a prior sentence is outstanding (e.g., a probation, parole, or supervised release violation warrant) shall be deemed to be under a

criminal justice sentence for the purposes of this provision if that sentence is otherwise countable, even if that sentence would have expired absent such warrant. See §4A1.2(m).";
by redesignating Note 5 as Note 4; in Note 4 (as so redesignated) by striking "§4A1.1(e)" each place such term appears and inserting "§4A1.1(d)";and by inserting at the end the following new note 5: "5. §4A1.1(e).

One point is added if the defendant (1) receives 7 or more points under §4A1.1(a) through (d), and (2) committed any part of the instant offense (i.e., any relevant conduct) while under any criminal justice sentence, including probation, parole, supervised release, imprisonment, work release, or escape status. Failure to report for service of a sentence of imprisonment is to be treated as an escape from such sentence. See §4A1.2(n). For the purposes of this subsection, a 'criminal justice sentence' means a sentence countable under §4A1.2 (Definitions and Instructions for Computing Criminal History) having a custodial or supervisory component, although active supervision is not required for this subsection to apply. [8]

The Commentary to §4A1.1 captioned "Background" is amended in the last paragraph by striking "Section 4A1.1(d) adds two points if the defendant was under a criminal justice sentence during any part of the instant offense" and inserting "Section 4A1.1(e) adds one point if the defendant receives 7 or more points under §4A1.1(a) through (d) and was under a criminal justice sentence during any part of the instant offense".

---

[8] For example, a term of unsupervised probation would be included; but a sentence to pay a fine, by itself, would not be included. A defendant who commits the instant offense while a violation warrant from a prior sentence is outstanding (e.g., a probation, parole, or supervised release violation warrant) shall be deemed to be under a criminal justice sentence for the purposes of this provision if that sentence is otherwise countable, even if that sentence would have expired absent such warrant. See §4A1.2(m).".

THOMAS AYODELE would like to emphasize the merits of the instant motion that is requesting application of the new <u>Amendment 821</u> to the Sentencing Guidelines in effect since November 1, 2023. Specifically, Part A **STATUS POINTS** and **Part C MARIJUANA POSSESSION** are been presented in the following pages for this Honorable District Court's favorable consideration.

### PART C (IMPACT OF SIMPLE POSSESSION OF MARIJUANA OFFENSES)

The Commentary to §4A1.3 captioned "Application Notes", as amended by Part B, Subpart 3 of this amendment, is further amended in Note 3 by striking the following: "Downward Departures.—A downward departure from the defendant's criminal history category may be warranted if, for example, the defendant had two minor misdemeanor convictions close to ten years prior to the instant offense and no other evidence of prior criminal behavior in the intervening period.

A departure below the lower limit of the applicable guideline range for Criminal History Category I is prohibited under subsection (b)(2)(A), unless otherwise specified.", and inserting the following: "Downward Departures.— (A) Examples.—A downward departure from the defendant's criminal history category may be warranted based on any of the following circumstances: (i) The defendant had two minor misdemeanor convictions close to ten years prior to the instant offense and no other evidence of prior criminal behavior inthe intervening period. (ii) The defendant received criminal history points from a sentence for possession of marihuana for personal use, without an intent to sell or distribute it to another person.

Specifically, Section 4A1.1(a) added 3 points for 2009 Marijuana possession adjudicating 10 years custody 7 years suspended, 3 years to serve followed by 5 years supervised probation. A Court must add 3 points for each prior sentence of imprisonment that

exceeds one year and one month. Prior sentences are always counted separately if the sentences were imposed for offenses that were separate by an intervening arrest (i.e. the defendant is arrested for the first offense prior to committing the second office). Id. "Add 2 points if the defendant committed the instant offense under **ANY CRIMINAL JUSTICE SENTENCE**, including probation, parole, supervised release, or escape status." See <u>United States v. Johnson,</u> 2023 U.S. Dist. LEXIS 102363.

## REASON FOR AMENDMENT 821

This amendment is the result of several Commission studies regarding the nature of the criminal history of federal offenders, including analyses of the number and types of prior convictions included as criminal history and the ability of the criminal history rules to predict an offender's likelihood of rearrest.

While these studies continue to recognize the close association between an offender's criminal history calculation under the guidelines and the likelihood of future recidivism, the amendment makes targeted changes to reduce the impact of providing additional criminal history points for offenders under a criminal justice sentence (commonly known as "status points"), to reduce recommended guideline ranges for offenders with zero criminal history points under the guidelines ("zero-point offenders"), and to recognize the changing legal landscape as it pertains to **SIMPLE POSSESSION OF MARIHUANA OFFENSES.**[9]

---

[9] These targeted amendments balance the Commission's mission of implementing data-driven sentencing policies with its duty to craft penalties that reflect the statutory purposes of sentencing.

## SENTENCING AKNOWLEDGED §4A1.1 FOR MARIJUANA POSSESSION

Notably, on June 13, 2023, Honorable District Court Judge Sharion Aycock, adopted USSG §4A1.1(a) for Marijuana Possession that increased THOMAS AYODELE's BOL by. 3 points. And in order to support favorable consideration for application of Amendment 821 the following official findings during sentencing hearing are hereby submitted:

**MR. TRAVIS:** "If it pleases the Court. Thank you. Your Honor. I know the Court has reviewed the sentencing memo filed on my client's behalf, and I would certainly ask the Court to consider the highlights that I've tried to make; that this young man, at the age of 40 now, had a criminal history category of II. However, that's based on a **2009 MARIJUANA CHARGE; during that era, a SIMPLE POSSESSION CHARGE.** I'd ask the Court to mitigate the weight of that that's inherent in that issue as we stand here today and countryside and it's relationship to **MARIJUANA** in general."

Sentencing Hearing Transcript at 5, lines 15-25.

**MR. TRAVIS:** "On the 3553, Your Honor, I think when he was in trouble before from the 2009 conviction, there was no indication, no inidicia whatsoever, that he did anything to dishonor his probation requirements. And, again, that was at the age of 22 when he's had his own prior felony conviction. He's just shown exemplary reliability, good conduct, and ethic. That speaks loudly for his integrity.

He mentioned briefly -- and I don't disagree with probation in the fact that there have been some minor usage of drugs, but he would be willing to enter into any substance abuse treatment program that the Court may deem appropriate.

Again, with -- you know, with that said and with the memo submitted, we're asking the Court for a downward departure. I don't think as it speaks -- from the time he was in

19

trouble from the 2009 conviction until this problem here before the Court today, he had not been in trouble at all. So with the exception of that, Your Honor. Thank you."

Sentencing Hearing Transcript at 6, lines 22-25, and at 7, lines 1-16.

**THE COURT:** "So, I have tried to take all of that into consideration. I don't necessarily think in any of these cases that the high end of the guidelines is appropriate.it seems to the Court that something more than a minimum sentence is the low end is justified in these -- in this case.

So, Mr. Ayodele, as I referenced and spoke with Mr. Smith, the sentence that I am going to impose is mid-guideline. It is, talking all of this into consideration, what is the adequate sentence but not to put you at the high end. So having explained that, the Court adopts the presentence investigation report without change.

The Court has previously sustained Objection Number 1 regarding the restraint enhancement.No count of conviction carries a mandatory minimum sentence.

The total offense level has been adjusted, based upon sustaining the two-level enhancement objection, to 31 versus 33. That changes the guidelines in this case, 121 to 151 months. This defendant does have a criminal history category of II, as compared to the other two defendants who have criminal history category of I....this consists of 60 months on Count 1 and 136 on Count 2....those sentences are to be served concurrently....you shall participate in a program of testing and treatment for substance abuse....you shall not possess, invest, or otherwise use **MARIJUANA OR MARIJUANA PRODUCTS** unless that is prescribed by licensed physician for a legitimate medical reason."

Sentencing Hearing Transcript at 8, lines 7-25, at 9, lines 1-3, at 10 lines 12-14, and at 11, lines 10-17.

## RELIEF SOUGHT

May this Honorable District Court apply <u>Amendment 821 PART A ans PART C (MARIJUANA POSSESSION)</u> lowering THOMAS AYODELE'S BOL 30 LOW END. Signed under pain and penalties of perjury <u>28 USC § 1746.</u>

Respectfully Submitted

Dated: *12-14-2023*

/s/ *Thomas Ayodele*

Thomas Ayodele, pro se

Prisoner No. 73342-509

FCC YAZOO CITY LOW II

P.O. Box 5000

Yazoo City, Mississippi 39194

## CERTIFICATE OF SERVICE

I, Thomas Ayodele certify that the forgoing Status Point Motion was filed within this Honorable District Court of Mississippi and a true copy was sent via first mail prepaid mail to the office of the Assistant District Attorney Robert J. Mims, at 900 Jefferson Avenue, Oxford, MS 38655. Signed under pain and penalties of perjury <u>28 USC § 1746.</u>

Dated: *12-14-2023*

/s/ *Thomas Ayodele*